459 So.2d 693 (1984)
Delmas H. BOSARGE, Jr.
v.
NEW ORLEANS STREET DEPARTMENT.
No. CA-1806.
Court of Appeal of Louisiana, Fourth Circuit.
November 14, 1984.
George R. Simno, III, Gertler & Gertler, New Orleans, for plaintiff-appellee (Delmas H. Bosarge, Jr.).
Salvador Anzelmo, City Atty., Douglas P. Wilson, Chief Deputy City Atty., Bernette J. Johnson, Deputy City Atty., New Orleans, for defendant-appellant (Department of Streets, City of New Orleans).
Before REDMANN, C.J., and KLEES and WILLIAMS, JJ.
KLEES, Judge.
The Department of Streets appeals the decision of the Civil Service Commission reinstating Delmas H. Bosarge, Jr. to his position of Traffic Engineer II in the Department with back pay subject to a suspension of 120 days. Bosarge appeals that part of the decision of the Commission to suspend him for 120 days for misuse of a city vehicle and other minor violations. We affirm the decision of the Civil Service Commission.
*694 FACTS
Delmas H. Bosarge, Jr. was employed by the Department of Streets, City of New Orleans, as a Traffic Engineer II. On December 15, 1982, he was dismissed from the Department for violation of departmental policies involving the use of a city vehicle and other minor infractions between May, 1982 and December, 1982.
In addition to being a Traffic Engineer II for the Department of Streets, City of New Orleans, Bosarge was a co-owner with his wife, of a corporation that operated a school in Jefferson Parish named "Academy de Chateau". In response to an anonymous letter stating that Bosarge was misusing the city vehicle, Agent Robert Mehrtens of the Office of Municipal Investigations (O.M.I.) conducted an investigation into the allegations contained in the letter. Agent Mehrtens drove to the Academy de Chateau, which was named in the letter, on May 11, 1982, and observed the city vehicle parked at the school. On that day, Bosarge was observed by Agent Mehrtens driving two children from the school to their home in the Lakeview area of New Orleans in the city vehicle.
In December, 1982, Agent Mehrtens observed the vehicle parked at the school on three separate occasions. He reported these observations to Joseph Womble, Ray Kaufman and Harold Gorman, Bosarge's superiors, on December 15, 1982. At that time, he requested an interview with Bosarge. During the course of the interview, Bosarge's superiors met and composed a letter of termination. Bosarge was given the letter of termination.
There can be no question that conduct which impairs the orderly operation of a public service in which an employee is engaged can be grounds for disciplinary action, such as dismissal. Sanders v. Department of Health and Human Resources, 394 So.2d 629 (La.App. 1st Cir. 1980), writ denied 399 So.2d 602 (La. 1981). Dent v. Department of Corrections, 413 So.2d 920 (La.App. 1st Cir.1982).
While "sufficient cause" is the key for disciplinary action, the jurisprudence indicates that the conduct of employees of a department is a crucial factor in maintaining an office that can properly serve the public. Leggett v. Northwestern State College, 242 La. 927, 140 So.2d 5 (La.1962); Dent v. Department of Corrections, supra. For this reason, a supervisor is given much latitude in exercising control of the employees over whom he has jurisdiction. Sanders v. Department of Health and Human Resources, supra.
The Court in Branighan v. Department of Police, 362 So.2d 1221, 1223 (La.App. 4th Cir.1978), said:
"The superintendent of police is charged with the operation of his department, and the Civil Service Commission is not his supervisor. The superintendent is the one who must run his department and exercise discretion in relation to disciplining his officers, and the Commission is not charged with exercising that discretion."
Nonetheless, Branighan, supra, also held that:
"... [t]he Civil Service Commission's authority `to hear and decide' disciplinary cases, Const. art. 10 § 12, includes authority to modify (reduce) as well as to reverse or affirm a penalty."
The scope of appellate review in these matters was established in Canter v. Koehring Co., 283 So.2d 716 (La.1973) and elaborated on in Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978):
"... appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be further determination that the record established that the finding is not clearly wrong (manifestly erroneous)."
Although this is the general rule of appellate review regarding rulings of the Civil Service Commission, in Merchant v. Department of Finance, 391 So.2d 587 (La. App. 4th Cir.1980), the court held that the usual guidelines for appellate review, i.e., the manifest error rule, are not applicable *695 where the evidence was taken before a hearing examiner and the record thus compiled was filed with the Commission without comment or recommendation. The court explained its reasoning as follows:
"The great weight accorded conclusions and determinations made by the trier of fact under Canter and Arceneaux is based on the advantage derived from personal observation of the witnesses, their demeanor on the stand, and the manner in which they responded to examination. Here, the Commission enjoyed no such advantage. Under these circumstances the standard of review by an appellate court is not unlike that of judicial review in other administrative matters, that is, whether the conclusion reached by the Commission is arbitrary or capricious or manifestly wrong."
The holding in Merchant was followed in McGee v. Sewerage and Water Board of New Orleans, 396 So.2d 430 (La.App. 4th Cir.1981). In both cases the court made an independent review of the record to determine whether the conclusion reached by the Commission was arbitrary or capricious or manifestly wrong. The procedure followed in Merchant and McGee was also used in the instant case, thus the standard pronounced in those cases should apply.
Our review of the Civil Service Commission's hearing revealed the following facts: O.M.I. Agent Robert Mehrtens, as the Appointing Authority's first witness, testified that pursuant to an anonymous letter complaining that Bosarge was using a city vehicle for other than City business, he conducted an investigation on May 11, 1982, by driving out to the Academy de Chateau. He observed a city vehicle parked in front of the school. Then he saw a man and two children get into the car which he followed to the children's home in Lakeview. Photographs were taken at the time and he subsequently identified Bosarge as the driver and the children as William and Robert Long.
Since other pressing business prevented further surveillance, the investigation was delayed until December, 1982, when Agent Mehrtens conducted three separate surveillances wherein he observed the car at the school. On two of the three occasions, he saw Bosarge drive to a nearby K-Mart and return to the school where he did some menial chores, i.e., picking up litter and getting the mail. On December 15, 1982, Agent Mehrtens reported his suspicions to Joseph Womble, Ray Kaufman and Harold Gorman of the Department of Streets. Bosarge was called into Kaufman's Office and told that Agent Mehrtens wanted to interview him.
Bosarge went to Agent Mehrtens' office and pursuant to La.R.S. 33:2426, was interviewed from 11:10 a.m. to 12:24 p.m. concerning his activities. After the interview, Agent Mehrtens left the office and returned about ten minutes later with a sealed envelope which he handed to Bosarge. Bosarge read the letter and told Agent Mehrtens he had been terminated from his position with the Department of Streets.
In connection with the investigation, Agent Mehrtens interviewed the parents of the two children. William Long testified before the hearing examiner that Agent Mehrtens interviewed him in July or August, 1982, although Agent Mehrtens testified it was in December. He testified that the children were brought home in the afternoon by Bosarge in the city vehicle since he was home to greet the children every day. Occasionally, another man would bring the children home. He said he paid fifty dollars a month for morning and afternoon transportation. Although the only proof of payment were two checks with notations on them for registration and tuition for the children. There were several inconsistencies between testimony before the commission and the statement given by Long to Agent Mehrtens.
Joseph Womble, City Traffic Engineer for the Department of Streets, testified that he was present at the meeting on December 15, 1982, when Agent Mehrtens advised him of the allegations. He said that when Bosarge came into the meeting he was told of the allegations and that *696 Bosarge said nothing. Womble stated that Agent Mehrtens told him what was said in the interview with Bosarge and, as a result of what was said, it was decided to terminate Bosarge. He admitted that at the meeting between Kaufman, Gorman and himself, no other disciplinary actions were discussed but he later changed his testimony by saying suspension for activities was discussed in detail for an hour or two. He said he did not review the statement given by Bosarge to Agent Mehrtens. Womble testified that he reviewed Bosarge's twelve year record with the city and interviewed fellow workers while Bosarge was interviewed by Mehrtens and before the letter to terminate was written.
At the request of Harold Gorman, Director of Department of Streets, Womble testified that he had conversations with Bosarge's previous supervisor concerning Bosarge's activities in November, 1982. He claimed that the previous supervisor said there was a problem with the hours Bosarge kept and that he suspected Bosarge was involved with the school, but could never prove it. He felt that because of the severity and flagrance of the violation and its apparent long standing nature, there were grounds for termination.
At the meeting on December 15, 1982, Harold Gorman ruled out suspension because of the severity of the offense and the long standing behavior of Bosarge. He relied on what was told to him by Womble. He personally did not make an investigation nor did he speak to Bosarge before or after the interview and subsequent termination.
Delmas H. Bosarge, Jr. testified that he had worked for the City for twelve years and had use of a city vehicle for six years. He believed the only restriction on the use of the car was that it was not to be taken to and from home since he lived outside of Orleans Parish. On occasion, he would take the car to the school where he ate lunch and one time he transported children (in the city vehicle) from the school in Metairie.
Bosarge testified he was a diabetic and, because of the difficulty in finding food for his special diet, his wife fixed lunch for him at the school. Usually, he would take the city vehicle to his Aunt's house in Lakeview where he would switch to his personal car for the drive to the school. Then he would return to Lakeview, switch cars, and go back to City Hall. However, on a few occasions, he would not switch cars.
He stated that he would on occasion take the Long children home and if no one was home he would go switch cars to save time. Then when someone was home he would go back to the house and leave the children. Steve Watsky, a teacher at the school, testified that he regularly brought the children home on his way to his house. The children walked in an open door and he rarely saw anyone greet them.
As a part of his job, Bosarge would have occasion to take the car across parish lines during business hours. Bosarge believed that since he was paid on a professional level it was not necessary for him to take his lunch at a specific time everyday or that he had to work strictly between the normal hours of 8:30 and 4:30. As long as he did his job, the variances in his hours did not matter. Additionally, in the twelve years with the city he had not ever been disciplined for any of his actions.
On December 15, 1982, Ray Kaufman called him to his office, informed him that Agent Mehrtens wanted to interview him, and told him to turn in the keys to the car since he would not use it that day. One-half hour later, he reported to the O.M.I. Office, where, before the interview, he requested legal assistance which he was told was unnecessary. Agent Mehrtens showed him a piece of paper that said, in essence, if he didn't speak during the interview, he would lose his job and not be able to work for City or State Government for ten years. Bosarge then submitted to the interview. He testified Agent Mehrtens left the office for five to ten minutes and returned with the letter of termination. At no time was Bosarge given a chance to talk with either Gorman, Kaufman or Womble.
*697 While this Court agrees that Delmas H. Bosarge, Jr. certainly has some culpability for his actions, we conclude as did the Commission that the record does not support termination from City employment. Reinstatement to his former position with back pay subject to a suspension of one hundred twenty days was deemed reasonable by the Commission. We can not find that this was clearly wrong.
Accordingly, the ruling appealed from is hereby Affirmed. All costs to be borne by Appellant.
AFFIRMED.
REDMANN, C.J., dissents.
REDMANN, Chief Judge, dissenting.
A New Orleans classified civil service employee, paid for seven hours of work daily during a specified eight-hour period, by spending, probably almost every day, two or three hours of those eight hours at (and in driving the city automobile assigned to him over 10 miles to and 10 miles back from) the private school in Kenner that he and his wife own, gives the city legal "cause," La. Const. art. 10 § 8(A), to fire him.

I.
The civil service commission would be wrong, as a matter of law, if its decision in this case were that that systematic, deliberate, double theft of hundreds of dollars of car use and thousands of dollars of time (at $14.71 per hour salary plus fringe benefits) is not sufficient cause for firing a city employee.
The commission's opinion does not concede those facts, however, on which the appointing authority fired Bosarge. The commission, on its reading of a typewritten record of a hearing examiner's hearing, disbelieves all the evidence that the appointing authority relied ondisbelieves the city investigator,[1] disbelieves the apparently disinterested father of two students at the school,[2] and believes instead the city employee's nonsensical, self-serving and uncorroborated tale of being diabetic and of therefore having a medical necessity to drive to Kenner to get lunch (from the K-Mart?)!
This writer must say, while noting his respect for the commission and its members, that the commission in this case overreaches its constitutional authority as protector *698 of city employees against discipline without "cause," and instead supplants the appointing authoritythe department head who must run the departmentby merely substituting its credibility evaluations for the reasonable ones of the appointing authority, supported by the commission's own hearing examiner's record. If one accept those reasonable and record-supported credibility evaluations by the appointing authority, one cannot conclude that the appointing authority did not have cause to fire Bosarge.

II.
"To the victor belong the spoils" was the former political principle of public employment. Employees hired by the previous political administration, whether competent and industrious or not, were fired by the political victors. Incompetent or slothful persons could be hired and promoted at the dictate of the political victors. Public employees could be obliged to pay "deducts" from their salaries to politicians' coffers, and to work in their political campaigns. Those who did not, or who for any other reason or no reason did not please the political bosses, could be demoted or fired without recourse.
That spoils system was years ago replaced by the civil service system, now embodied in La. Const. art. 10. The civil service system intends to protect public employees and the public at large against those and similar evils. It provides "appointments and promotions ... only after certification ... under a general system based upon merit, efficiency, fitness, and length of service ...," art. 10 § 7. It prevents political activity, forced or voluntary, § 9. It disallows disciplinary action against a classified employee "except for cause expressed in writing," allows appeal to the commission with the burden of proof upon the appointing authority, § 8(A), and allows further review "on any question of law or fact" by the court of appeal, § 12.
The commission's constitutional role of guardian against political or other disciplinary action "except for cause," § 8(A), entitles it to deference from the courts in its determination of both whether the established facts constitute legal cause and whether the discipline is commensurate with that cause. Walters v. Dept. of Police of N.O., 454 So.2d 106 (La.1984). More to our point, the commission's role obliges it to make underlying factual findings in respect to whether cause exists, and therefore also entitles the commission's factual findings to deference from the courts, which "should not reverse or modify such a finding unless it is clearly wrong or manifestly erroneous." Id. at 114.
Yet the appointing authoritythe department headalso has a role that obliges him or her to make factual findings. The appointing authority necessarily has the duty to administer his or her governmental unit, to discipline or fire employees who do not do their work or who otherwise impair the efficiency of the public servicewho no longer have the "merit, efficiency, [and] fitness," art. 10 § 7, that justified their employment in the first place. If he or she is to perform that duty, the appointing authority cannot escape making factual findings, including some based on credibility evaluations. When the appointing authority does make factual findings, are his or her reasonable factual findings, if supported by the commission's hearing examiner's record, entitled to some deference from the commission (in the absence of record circumstances showing that the appointing authority was wrong)?
This writer would conclude that, although the courts may not reverse the civil service commission's factual findings unless clearly wrong, the commission equally may not reverse the appointing authority's factual findings unless probably wrong on the basis of the record before the commission. The commission exceeds its authority and oversteps its constitutional role if it merely substitutes its reasonable factual inferences for the appointing authority's reasonable factual inferences (when the latter are supported by and not probably wrong on the basis of the commission's hearing examiner's record). That is, with *699 all due respect, all that the commission did in this case.

III.
The commission's decision should therefore be reversed. Bosarge does have some pay coming to him, however. The matter should be remanded to the commission to fix the amount the city should pay Bosarge for the hours worked December 15, 1982 before he was fired, and for the 129 days of payable leave accrued, less some reasonable calculation of the time he was paid for but did not worksay an hour and a half a school day at least from the beginning of the 1981 school year, if not for the entire time he owned the Kenner schooland any leave attributable to that unworked time, and less a reasonable mileage charge for, say, 20 miles a day during that same period.
NOTES
[1] Office of Municipal Investigations investigator Robert Mehrtens testified that, prompted by an anonymous letter whose self-accrediting detail reminds one of that in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), he conducted surveillance on three occasions at the Kenner school.

The first time, May 11, 1982, the city's Chevette was already at the school when Mehrtens arrived at 1:25 p.m. At 2:50 p.m., Bosarge emerged from the school with two young children and drove them in the Chevette back to New Orleans.
The second time (Mehrtens having meanwhile been too busy with other investigations to pursue this one), December 3, Bosarge arrived at 1:30 p.m., shortly left to go to a nearby K-Mart store, where he got "two styrofoam food cartons," and then returned with the food cartons to the school. At 2:43 p.m. he exited the school to return in the Chevette to city hall in New Orleans.
The third time, December 6, Mehrtens arrived at the school at 12:25 p.m. The Chevette was already there. At 1:15 p.m. Bosarge went to K-Mart, got two styrofoam food cartons, and at 1:35 returned to the school. At 2:46 p.m. Bosarge left the school and in the Chevette returned to city hall.
(On a fourth occasion, on December 13, at 2:35 p.m., when just passing by the school, Mehrtens again saw the city's white Chevette assigned to Bosarge parked there.)
[2] William Long III, the father of the two children whom Bosarge had brought from the school in Kenner to their home in New Orleans in May, 1982, testified: "Q. How were they transported to and from school? A. During the year of '81, '82 ... in the afternoon they were dropped off by Mr. Bosarge.... Most of the time it was a small white Chevette ... it had a city sticker on the side of the automobile. Q. Did it say City of New Orleans? A. Yes, it did. It was red, white and blue with the fleur de lis." "Mr. Bosarge brought [the children] home at the time you're talking about every day, with the exception of maybe one or two days." "He used the city vehicle with the exception of a very few times he was in another automobile." Long paid the school (owned by Bosarge and his wife) $50 a month for transportation. (The Long children did not attend the Kenner school in 1982-1983.)