| NHA DO | * | NO. 2025-CA-0062 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| DEPARTMENT OF SAFETY & PERMITS | * | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
CITY CIVIL SERVICE COMMISSION ORLEANS
NO. 9564  C\W 9599
Honorable Jay Alan Ginsberg, Hearing Officer
\* \* \* \* \* \*
**Judge Rosemary Ledet**
\* \* \* \* \* \*

(Court composed of Judge Daniel L. Dysart, Judge Rosemary Ledet, Judge Paula A. Brown)

Robert J. Ellis, Jr.
Salvador I. Bivalacqua
GRIFFIN & BIVALACQUA, LLC
650 Poydras Street, Suite 2615
New Orleans, LA 70130

COUNSEL FOR PLAINTIFF/APPELLANT

William R. H. Goforth
ASSISTANT CITY ATTORNEY
James M. Roquemore
CITY OF NEW ORLEANS LAW DEPARTMENT
Corwin M. St. Raymond
ASSISTANT CITY ATTORNEY
Donesia D. Turner
CITY ATTORNEY
1300 Perdidio Street, Room 5E03
New Orleans, LA 70112

COUNSEL FOR DEFENDANT/APPELLEE

**AFFIRMED**
**July 14, 2025**

*RML*

*DLD*

*PAB*

This is a civil service case. Appellant/Employee—Nha Do ("Mr. Do")—seeks review of the November 12, 2024 decision of the Civil Service Commission for the City of New Orleans ("the Commission"). The Commission's decision upheld Mr. Do's termination by Appellee/Employer (Appointing Authority)—the Department of Safety and Permits (the "Department"). For the reasons that follow, this Court affirms the Commission's decision.

## FACTUAL AND PROCEDURAL BACKGROUND

In February 2024, the Department's director—Tammy Jackson ("Ms. Jackson")—notified Mr. Do, by letter, of his emergency, sixty-day suspension for, among other things, violation of the Department's Conflict of Interest policy, codified in Employee Policy Memorandum 13-10, Applications and Payment for Departmental Services, Employee Transactions with the Department ("Memo 13-10").[1] Two months later, following an investigation and a pre-termination hearing, the Department terminated Mr. Do. At that time, Mr. Do was a fifteen-year

---

[1] For ease of discussion, Memo 13-10 is quoted elsewhere in this opinion.

1

permanent, classified employee of the Department; his job title was Chief Electrical Inspector.

Mr. Do appealed his termination to the Commission.[2] Following a hearing at which witnesses were called and evidence was introduced, the Hearing Examiner, appointed by the Commission, recommended granting Mr. Do's appeal. Rejecting the Hearing Examiner's recommendation, a majority of the Commission—one Commissioner dissented—denied Mr. Do's appeal and affirmed his termination.

Although the Department cited five alleged violations in support of Mr. Do's termination, the Commission relied on only one—that he improperly closed out permits on four properties he owned in 2016 and 2017 (the "Conflict of Interest/Memo 13-10 Violation").[3] Memo 13-10 provides as follows:

Employee Transactions with the Department

Employees are not permitted to process any application or transaction or conduct any inspections on properties or projects in which that employee has a financial interest either directly or indirectly. . . .

---

[2] Although Mr. Do appealed both his suspension and termination, we refer only to his termination for ease of discussion.

[3] Because we find no error in the Commission's determination that the Conflict of Interest/Memo 13-10 Violation was a valid cause for termination, we pretermit addressing the other four alleged violations, which were as follows:

- That he had a "more than 25% interest in" (later alleged to be a thirty-three percent (33%) owner) of D3 Contractors, LLC ("D3");

- That on the two of the properties the permit applications undervalued the work to be completed in 2016-2017;

- That on the two of the properties the permit applications contained the incorrect work to be completed in 2016-2017; and

- That he failed to cooperate with the Office of Inspector General ("OIG").
.

2

Employees requiring permits for improvements to their own personal property are authorized to apply for permits through the online permitting and licensing portal outside of regular business hours or may use personal time (breaks or Annual Leave) for in-person transactions. Employees are not authorized to process payments or edit permit data relating to their own projects. All payments, edits, inspections, and other processes are to be completed by other employees in the Department of an equal or higher rank.

The relevant facts regarding the Conflict of Interest/Memo 13-10 Violation are as follows. In 2008, the Department hired Mr. Do as an electrical inspector. Sometime after 2017,[4] the Department promoted Mr. Do to Chief Electrical Inspector. According to Mr. Do, his job duties as an electrical inspector included performing electrical inspections, monitoring other employees' processing of permits, performing administrative tasks related to electrical permits, and releasing meters. Mr. Do described his job as encompassing the "whole nine yards in electrical."

In addition to his electrical inspector job, Mr. Do was the sole owner of NDT Investments, LLC ("NDT"). NDT was in the business of buying and flipping houses. During the relevant period, NDT purchased properties in the New Orleans and Metairie areas. NDT then contracted with D3 Contractors, LLC ("D3"), a construction company, to renovate the properties before selling them. Mr. Do's brother—Hoai Do—was the sole owner of D3.[5]

In May 2013, Mr. Do signed and acknowledged receipt of Memo 13-10. Mr. Do testified that he understood the rules set forth in Memo 13-10 were binding on

---

[4] The record only reflects that Mr. Do was promoted after the 2016 and 2017 transactions at issue.

[5] Mr. Do's other brother, Hoang Do, was the agent for service of process for NDT; he also performed volunteer work for the Department.

him. Mr. Do also acknowledged that he was aware Memo 13-10 limited employees' activities.

In 2016 and 2017, Mr. Do closed out permits and issued a certificate of occupancy or completion for several NDT-owned properties on which D3 performed construction work. Mr. Do failed to disclose his ownership in NDT to the Department.

In 2020,[6] Ms. Jackson became the Department's director. In conjunction with the OIG's investigation into another employee's alleged public corruption, Ms. Jackson discovered what she characterized as a pattern of deliberate conflict of interest violations by Mr. Do. According to Ms. Jackson, she discovered that Mr. Do's company, NDT, had applied for and obtained permits on at least four of its properties. According to Ms. Jackson, Mr. Do's deliberate misconduct was two-fold: (i) failing to disclose his ownership in NDT to the chief electrical or building inspector; and (ii) participating in the permitting process for the multiple NDT-owned properties. When questioned regarding the file pertaining to one of these NDT-owned properties, Ms. Jackson testified that "[Mr. Do] should not have been closing or touching this file because he owned the property. That's a clear conflict. That is policy. That was — that predates me."

Ms. Jackson, in the April 2024 termination letter that she sent to Mr. Do, stated:

---

[6] Both Mr. Do and the Hearing Examiner state that Ms. Jackson became director in 2021. But, Ms. Jackson testified that she became director is 2020. Depending on the context, we use both dates interchangeably in this opinion.

- In the pre-termination hearing, you confirmed you are the sole owner/member of NDT. . . . Previously, as early as 2016, you completed events, and/or inspections on properties which you and/or a relative has an interest; this is a conflict of interest;

- Your failure to recuse yourself from processing the permits of these [four] properties[7] violates Departmental Policy Memorandum 21-01 Standards of Professional Behavior: Section 111: Gifts, Gratuities, Rewards, Conflicts of Interest;

- Furthermore, by performing any review or processing of permit applications of these properties, you are in violation of [Memo 13-10];

- In addition to confirming the ownership interest in the companies identified in the pre-termination letter, you stated that you "do not handle permit and inspection". However, a screen shot of the event path on the building permit for 4611 Cartier [one of the four NDT-owned properties at issue] shows that you completed the Inspection finaled [sic] event. When the screen shot was shown to you, you did not deny that it was accurate. The customer for 4611 Cartier would have been you, as the owner of this property, your finaling [sic] of the inspection was a clear conflict.

- Lastly, the Louisiana Code of Ethics dictates that it is essential to proper operation that public employment is not used for private gain and that there be public confidence in the integrity of government.

Following an evidentiary hearing, the Hearing Examiner recommended that Mr. Do's appeal be granted because the Department failed to establish by a preponderance of evidence that it disciplined Mr. Do for cause. Disagreeing with the Hearing Examiner's recommendation, the Commission found that the Department established the occurrence of the complained-of-conduct, that the conduct impaired the Department's efficient operation, and that the discipline imposed (termination) was commensurate with the offense. The dissenting

---

[7] The four properties listed in both the suspension and termination letters are as follows: (i) 4860-4862 Gilbert; (ii) 4611 Cartier; (iii) 4605 Cartier Ave.; and (iv) 4623 Cartier Ave. All four properties were owned by NDT. As noted elsewhere in this opinion, Mr. Do admits that he closed out the permits on several of these properties in 2016 and 2017. But, as to 4623 Cartier Ave., Mr. Do testified that his brother, Hoang Do, closed out the permit on that property at a time when his brother was working for the Department on a volunteer basis as an inspector.

Commissioner, however, characterized the Department's evidence as weak and observed that "[o]ther than 'closing out' permits on his own properties in 2016 and 2017, which Mr. Do admitted, [the Department] wholly failed to support the alleged complained-of conduct in the suspension and termination letters." This appeal followed.

## LEGAL PRINCIPLES AND STANDARD OF REVIEW

The Louisiana Constitution provides that "[n]o person who has gained permanent status in the classified state or city service shall be subjected to disciplinary action except for cause expressed in writing." LA. CONST., ART. X, § 8(A). An employee subjected to disciplinary action by his or her appointing authority has the right to appeal to the Commission. *Hardy v. Juv. Just. Intervention Ctr.*, 21-0715, p. 6 (La. App. 4 Cir. 6/16/22), 343 So.3d 288, 293.

Simplified,[8] before the Commission, the appointing authority has the burden of proving a trio of elements—(1) the occurrence of the complained-of conduct—

---

[8] Broken down, the governing principles are as follows:

• [The Commission] is required to decide independently from the facts presented whether the appointing authority has a good or lawful cause for taking disciplinary action and, if so, whether punishment is commensurate with the dereliction.

• The appointing authority has the burden of proof as to the facts. LA. CONST., ART. X, § 8(A).

• The appointing authority must prove by a preponderance of the evidence the occurrence of the complained of activity and prove that the conduct complained of impaired the efficiency of the public service and that it bears a real and substantial relationship to the efficient operation of the public service.

• The legal basis for [The Commission] making any change in the appointing authority's disciplinary action is limited to the appointing authority's failure to establish sufficient cause for its disciplinary action.

• In this context, the term cause has two components—(i) the occurrence of the complained-of conduct; and (ii) an impairment of public service in which the appointing authority is engaged.

misconduct; (2) the impairment, as a result of the misconduct, of the department's efficiency; and (3) the imposition of discipline commensurate with the misconduct—punishment. *Morrison*, 22-0051, pp. 6-7 (La. App. 4 Cir. 7/13/22), 344 So.3d at 265.

The Commission's final decision is "subject to review on any question of law or fact upon appeal to the court of appeal wherein the commission is located." LA. CONST., ART. X, § 12(A). In reviewing a Commission's final decision, this Court must engage in the following multifaceted review:

> Initially, deference should be given to the factual conclusions of the civil service commission. A reviewing court should apply the clearly wrong or manifest error rule prescribed generally for appellate review. Then, the court must evaluate the commission's imposition of a particular disciplinary action to determine if it is both based on legal cause and is commensurate with the infraction; the court should not modify the commission's order unless it is arbitrary, capricious, or characterized by abuse of discretion. "Arbitrary or capricious" means the absence of a rational basis for the action taken; "abuse of discretion" generally results from a conclusion reached capriciously or in an arbitrary manner.

*Mathieu v. New Orleans Pub. Libr.*, 09-2746, pp. 5-6 (La. 10/19/10), 50 So.3d 1259, 1262-63 (internal citations omitted).

## DISCUSSION

On appeal, Mr. Do contends that the Commission erred in the following respects:

- Finding that Mr. Do violated [Memo 13-10] by "processing" permits for his own properties, despite the closing-out of permits being a purely

---

• [The Commission], thus, must first determine if the appointing authority has met its initial burden—established the occurrence of the complained-of conduct and the impairment. If that initial burden is met, then [The Commission] must determine if the discipline imposed is commensurate with the misconduct.

*Morrison v. New Orleans Police Dep't*, 22-0051, p. 6 (La. App. 4 Cir. 7/13/22), 344 So.3d 259, 264-65 (internal quotations and case citations omitted).

ministerial task that was a practice that was allowed and commonplace at the time;

- Finding that Mr. Do's actions impaired the efficient operation of the public service; and

- Granting the ultimate penalty of termination.[9]

Mr. Do's contentions coincide with the trio of factors that the appointing authority has the burden of establishing before the Commission—misconduct, impairment, and punishment. *Morrison*, 22-0051, pp. 6-7, 344 So.3d at 265. Accordingly, we organize our analysis around those three factors.

**Misconduct**

The Commission found that the Department met its burden of proving the misconduct. The Commission defined the misconduct as Mr. Do issuing "certificates of completion, meter releases, and/or certificates of occupancy on properties he owned, in clear violation of departmental policy." Mr. Do does not dispute that, in 2016 and 2017, he closed out permits on several NDT-owned properties.[10] Rather, he disputes the Commission's finding that his admitted conduct violates Memo 13-10. He contends that this Court should reverse the Commission's decision because his admitted conduct (i) was not a transaction, as that term is used in Memo 13-10, requiring his recusal; (ii) was in accord with custom and practice during the relevant period; and (iii) was the performance of an administrative task.

---

[9] Mr. Do additionally assigned as error the Commission's "[a]ccrediting speculative and unsubstantiated allegations while ignoring unrefuted evidence to the contrary by accepting the appointing authority's assertions about undervalued permit fees and improper permit types." This assignment is not relevant here. As the Department contends, the factual issues regarding "undervalued permit fees" and "improper permit types" are irrelevant to the reason that the Commission denied Mr. Do's appeal—the Conflict of Interest Memo 13-10 Violation.

[10] As the dissenting Commissioner observed, Mr. Do admitted closing out permits on his own properties in 2016 and 2017.

*Transaction under Memo 13-10 requiring recusal*

Mr. Do first contends that his admitted conduct—closing out permits on his companies' properties—does not fall within the scope of a transaction covered by Memo 13-10 and, thus, did not require his recusal. According to Mr. Do, Ms. Jackson was the first director to inform him that he lacked the authority to close out permits; and he followed her directive. Until then, he neither interpreted the policy (Memo 13-10), nor was he informed by anyone in a position of authority that he could not close out permits. Mr. Do contends that the Department's action against him is an improper attempt to enforce Ms. Jackson's change in policy, which he contends did not become effective until 2021, retroactively to transactions that occurred in 2016 and 2017.

> Agreeing with Mr. Do's contention, the Hearing Officer observed:
>
> [D]uring the relevant period, [the Department] did not consider closing out a permit a transaction from which [Mr. Do] was required to recuse himself. At best, the term "transaction", as found in [Memo] 13-10, is an undefined word that was not interpreted until 2021 to include closing out permits.
>
> And lastly, [Mr. Do] derived no financial benefit from closing out permits on properties that he owned. The record supports a conclusion that [Mr. Do] acted the same with his own properties as properties in which he had no financial interest. When he was informed that this practice created a perception of a conflict of interest in 2021, he ceased the practice.

Contrary to Mr. Do's contention and the Hearing Officer's observation, the word transaction in Memo 13-10 is not ambiguous. As the Department points out, although Memo 13-10 does not define the term transaction, the Louisiana Code of Ethics defines a similar term—"transaction involving the governmental entity." *See* La. R.S. 42:1102(23)(a) (providing that "transactions involving the governmental entity" include "any proceeding, application, submission, request for

9

a ruling or other determination, contract, claim, case, or other such particular matter" which the public servant "knows or should know would be the subject of action by the governmental entity").[11] There is not an exclusion in La. R.S. 42:1102(23)(a) for *de minimus* transactions.

Likewise, Memo 13-10 does not contain an exclusion for transactions that do not financially benefit an employee. Rather, Memo 13-10 prohibits certain transactions that create an appearance of impropriety or a conflict of interest. *See Tebbe v. Louisiana Comm'n on Ethics for Pub. Emps.*, 540 So.2d 270, 273 (La. 1989) (observing that "[a] conflict of interest arises when a public servant is torn between serving two masters: his private interest and the interest of the public").

The purpose of conflict of interest provisions—like Memo 13-10—is "to prevent public officers and employees from becoming involved in conflicts of interest. It is not merely wrongdoing, but even the potential therefor, that the Code seeks to avoid." *A.P.E., Inc. v. City of New Orleans*, 13-1091, p. 9 (La. App. 4 Cir. 1/15/14), 132 So.3d 475, 481 (quoting *In re Sea Shell, Inc.*, 509 So.2d 90, 91 (La. App. 1st Cir. 1987) (affirming a finding that a corporation wholly owned by a parish president's siblings violated the ethics code by entering into a contract with the parish to supply shell)). Moreover, conflict of interest provisions are strictly construed. *A.P.E.*, 13-1091, p. 9, 132 So.3d at 481 (citing 3 Eugene McQuillin, THE LAW OF MUNICIPAL CORPORATIONS § 12:173.22 (3rd ed. 2012)).

Applying those principles, we conclude that Memo 13-10 is unambiguous; it prohibits employees from processing any transaction on properties in which they

---

[11] *See also* La. R.S. 42:1112 (prohibiting public employees from participating in transactions in which the employee or the employee's immediate family member has a substantial economic interest).

have an interest. Indeed, even the dissenting Commissioner observed that "[b]ased on the documents offered into evidence, Mr. Do's conduct of 'closing out' permits was a conflict of interest under departmental policy [Memo 13-10]." Thus, Mr. Do's contention that closing out of a permit is not a transaction governed by Memo 13-10 is unpersuasive.

*Accepted custom and practice during the relevant period*

Mr. Do next contends that the Department should be precluded from disciplining him for following the accepted custom and practice, before Ms. Jackson became director, that authorized him to close out permits. In support of this argument, Mr. Do cites the testimony of his three witnesses—three former Department employees—that, during the relevant period, Mr. Do acted consistently with accepted custom and practice in closing out permits.

A similar argument was rejected in *Bolar v. Dep't of Pub. Works-Water*, 95-346 (La. App. 5 Cir. 10/31/95), 663 So.2d 876. In *Bolar*, the policy at issue prohibited an employee from using a Parish-owned vehicle for personal business. The plaintiff-employee contended that the accepted custom or practice allowed him to violate the policy. The appellate court framed the issue as whether, assuming that the former director allowed the plaintiff-employee to use the assigned vehicle for personal use, the department can now discipline the plaintiff-employee for violating the policy. *Bolar*, 95-346, p. 4, 663 So.2d at 878-79. Answering that question in the affirmative, the appellate court observed: "[e]ven if we assume the [plaintiff-employee's] former director deliberately acquiesced [in] the violation of the Department's rules by permitting this [employee] to use his

11

assigned Parish vehicle for personal benefit, the instant conduct is clearly improper and serves as a legitimate basis for disciplinary action." *Bolar*, 95-346, p. 4, 663 So.2d at 879.[12]

By analogy, even assuming the accepted custom and practice under the former directors authorized Mr. Do to close out permits on his companies' properties, the Department would not be precluded from disciplining Mr. Do for doing so. Contrary to Mr. Do's suggestion, the record is devoid of any evidence that the current disciplinary charge against him is an improper, retroactive attempt to discipline him for a change in policy. Memo 13-10 has always prohibited closing out permits on property in which an employee has an interest. In this regard, Ms. Jackson testified, as noted elsewhere in this opinion, that Mr. Do's conduct of closing out permits on properties that his company owned was "a clear conflict. That is policy. That was — that predates me." Hence, Mr. Do's custom and practice argument is unpersuasive.

*Performance of an Administrative Task*

Mr. Do's final contention regarding the misconduct factor is that closing out permits is merely an administrative task and that the Commission erred in mischaracterizing this administrative task as a serious policy violation. In support, Mr. Do cites his testimony explaining that the permitting process has multiple parts and emphasizing that his role in the transactions at issue was limited to the final,

---

[12] *See also Sanders v. Dep't of Health & Hum. Res.*, 394 So.2d 629, 631-32 (La. App. 1st Cir. 1980) (observing that "charges of improper conduct, though condoned by an employee's superior, may nevertheless be grounds for disciplinary action brought by a subsequent occupant of the superior position if such charges of improper conduct are the real motive for the disciplinary action").

administrative part of closing out the permits.[13] Mr. Do also emphasizes that closing out permits can only occur after an independent inspection is conducted and approved. He further testified that he had to close out permits because very few other employees were available who had access to the LAMA system—the Department's computerized system on which permitting events were recorded and applications were submitted. In still further support of his position, Mr. Do cites the testimony of his three witnesses—former Department employees—that processing a certificate of completion was a purely administrative step and had nothing to do with approving a permit application or conducting an inspection.

Agreeing with Mr. Do's position, the dissenting Commissioner observed that the testimony of Mr. Do and his witnesses established that closing out permits was a purely administrative task. Mr. Do's evidence, the dissenting Commissioner observed, was unrebutted by any witness with personal knowledge. The Department's sole witness—Ms. Jackson—acknowledged that she lacked personal knowledge of the Department's custom and practice before she became director in 2020. The dissenting Commissioner, thus, observed that the Department failed to rebut Mr. Do's evidence that the custom and practice of the Department was to treat closing out permits as a purely administrative task under previous directors.

Rejecting Mr. Do's characterization of closing out a permit as a purely administrative task, the Commission observed that it credited Ms. Jackson's testimony that closing out a building or an electrical permit required review by an

---

[13] According to Mr. Do, the process is as follows: (i) application is submitted by the contractor; (ii) zoning review; (iii) application review; (iv) plan review; (v) permit is approved and issued, or additional information is requested; (vi) inspection—pass or fail; and (vii) close out—a certificate of occupancy is issued.

inspector and, thus, was not merely an administrative task. The Commission further observed that "the grant of authority to 'close out' permits only to inspectors support[ed] the Director's testimony." We agree. Indeed, one of Mr. Do's witnesses—Donna Foley, the Department's former electrical secretary—testified to this fact. As the Commission observed, Ms. Foley testified that "only inspectors could issue a certificate of occupancy, and that she lacked this authority."

Regardless, even if closing out permits can be characterized as a purely administrative task, Memo 13-10 does not differentiate between administrative transactions and other type transactions. As the Department contends, "closing out permits is still a prohibited 'transaction' under the Department's conflicts of interest policy." Memo 13-10's plain language prohibits an employee from engaging in any transactions in which the employee has an interest. Thus, the term transaction in Memo 13-10 is broad and encompasses any aspect of processing a permit. Mr. Do's argument that closing out permits is a mere administrative task outside the scope of Memo 13-10 is unpersuasive. The record supports the Commission's finding that the Department met its burden of proving the misconduct factor by a preponderance of the evidence.

**Impairment**

Addressing the impairment factor, the Commission found that the Department carried its burden of showing impairment; it observed:

> Ms. Jackson testified that Mr. Do exhibited a pattern of failing to disclose a conflict of interest between his personal financial interest and his official duties. He also created a perception of self-dealing. As Ms. Jackson stated in the termination letter, Mr. Do's conduct impaired the "public confidence in the integrity of government." Mr. Do approved transactions in the permitting process in which he and his brother had a

14

personal financial interest. Enforcement of conflict of interest policies is essential to combating public corruption.

Mr. Do contends that the Commission erred in concluding that his actions impaired the efficient operation of the public service or could be seen as self-dealing. In support, he cites the lack of any evidence of actual harm caused by his conduct—no delays, no financial loss to the Department, no danger to the public, and no undermining of any specific project. He points out that the transactions at issue occurred in 2016 and 2017, before Ms. Jackson—the Department's only witness—became director. He contends that the Commission's reliance on a speculative perception of self-dealing and a generalized loss of public confidence is misplaced. Mr. Do suggests that the Hearing Examiner's factual findings should be given greater deference than the Commission's findings. This contention is unpersuasive.

The Commission is "not bound to accept the hearing examiner's factual determinations and recommendation." *Jenkins v. New Orleans Police Dep't*, 22-0031, p. 2 n.4 (La. App. 4 Cir. 6/22/22), 343 So.3d 238, 240 (internal quotations and citation omitted); *see also Moton v. Sewerage & Water Bd. of New Orleans*, 22-0747, p. 12 (La. App. 4 Cir. 5/10/23), 368 So.3d 151, 158 (quoting *Jenkins*, *supra*). "The hearing examiner does not have the authority to make a final decision or to uphold or reverse disciplinary action. That function lies solely with the Commission." *Saacks v. City of New Orleans*, 95-2074, p. 20 (La. App. 4 Cir. 11/27/96), 687 So.2d 432, 444 (citing LA. CONST., ART. X, § 12(B)). The Hearing Examiner's report is merely part of the record that is to be considered by the

Commission in making its determination. Here, the Commission reviewed the Hearing Examiner's report and rejected the Hearing Examiner's recommendation that Mr. Do's appeal be granted. It is the Commission' decision, not the Hearing Examiner's recommendation, that is before us.

The Commission correctly concluded that the Department proved the impairment factor. *See Penn v. New Orleans Police Dep't*, 01-1240, p. 3 (La. App. 4 Cir. 3/6/02), 812 So. 2d 847, 849 (rejecting employee's argument that "an alleged minor infraction" was insufficient to show an impairment of the appointing authority's efficient operation). As the Department points out, the Commission correctly credited Ms. Jackson's testimony that Mr. Do exhibited a pattern of failing to disclose a conflict of interest between his personal financial interest and his official duties.

In addition, Ms. Jackson testified that Mr. Do's pattern of failing to disclose his conflict of interest created a perception of self-dealing and impaired public confidence in the Department's integrity. At the hearing, Ms. Jackson testified as follows:

> With NDT Investments, you know, actually completing building events as well as electrical events on property that [Mr. Do] owned, I think that creates the perception of the self dealing when someone sees that properties that an inspector owns is being completed by the same inspector and/or his relative.

As the Commission noted, Mr. Do's conduct "impaired the 'public confidence' in the integrity of government." Thus, Mr. Do's argument that the impairment factor was not met is unpersuasive.

**Punishment**

Lastly, the Commission found the Department carried its burden of showing the punishment—termination—was commensurate with the offense; the Commission observed:

> Termination is commensurate with Mr. Do's pattern of disregard of the conflict of interest policy of [the Department]. Mr. Do approved transactions in the permitting process in which he and his brother had a personal financial interest. Enforcement of conflict of interest policies is essential to combating public corruption.

Citing his lengthy employment with the Department coupled with his lack of a prior disciplinary record, Mr. Do contends that the Commission erred in upholding the most severe penalty of termination. The Department counters that termination is commensurate with Mr. Do's pattern of violations. The Department contends that Mr. Do's repeated misuse of his authority to close out permits on his own properties demonstrated a pattern of policy violations, which supports termination.

Conduct that "impairs the orderly operation of a public service in which an employee is engaged can be grounds for disciplinary action, such as dismissal." *Bosarge v. New Orleans St. Dep't*, 459 So.2d 693, 694 (La. App. 4th Cir. 1984) (citations omitted). Lengthy tenure and lack of prior discipline are merely mitigating factors that can be considered in determining the appropriate punishment. *See Lange v. Orleans Levee District*, 10-0140, p. 17 (La. 11/30/10), 56 So.3d 925, 936 (observing that "longtime employment and lack of prior discipline may be mitigating factors in the determination of an employee's punishment"). "Repeated infractions by an employee may justify dismissal." *Fernandez v. Jefferson Par. Dep't of Pub. Works-Sewerage*, 22-319, p. 8 (La. App. 5 Cir. 2/27/23), 359 So.3d 531, 537; *see also Bolar*, 95-346, p. 4, 663 So.2d at 879

17

(citing pattern of misconduct in upholding decision to terminate employee for violating policy prohibiting private use of Parish vehicles). Such is the case here.

Ms. Jackson testified that the reason the Department terminated Mr. Do was because of the pattern of violations. Given the Department established a pattern of misconduct, we conclude that the Commission did not err in finding the Department met its burden of establishing that the punishment, termination, was commensurate with the violation.

## **DECREE**

For the foregoing reasons, the November 12, 2024 decision of the Civil Service Commission for the City of New Orleans is affirmed.

**AFFIRMED**

18